IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ORIN TURNER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civ. Action No. 14-276-GMS |
| | ) | |
| WARDEN PIERCE and SGT. DOME, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM

**I. INTRODUCTION**

The plaintiff, Orin Turner ("Turner"), who proceeds *pro se* and has been granted leave to proceed without prepayment of fees, filed this lawsuit pursuant to 42 U.S.C. § 1983 alleging violations of his constitutional rights. Before the court is the motion for summary judgment of the defendants Warden Pierce ("Pierce") and Sgt. Dome ("Dome") (together "the defendants"), Turner's opposition thereto, and his motion to dismiss the motion for summary judgment as untimely.[1] (D.I. 22, 24.) For the reasons that follow, the court will grant the defendants' motion for summary judgment and will deny Turner's motion to dismiss.

**II. BACKGROUND**

Retaliation claims against Pierce and Dome survived following screening of the amended complaint, and all other claims and defendants were dismissed.

---

[1] Turner's motion (D.I. 24) will be denied. On January 20, 2015, the court gave the defendants until February 5, 2015, to answer or otherwise plead to the complaint. (*See* D.I. 20.) The defendants' motion to dismiss, or in the alternative, for summary judgment was timely filed on February 5, 2015. (*See* D.I. 22.)

### A. Allegations in the Amended Complaint (D.I. 11)

Turner alleges that in July 2013, he was moved to the D/East Building, a Medium-High Security Unit ("MHU"). Upon his arrival, he encountered Dome who advised Turner that he would not be there long because he did not want trouble in his building. According to Turner, Imam Anas ("Imam Anas") placed him on a list to attend religion classes Monday through Thursday, but Turner was only allowed to attend Friday prayers. Turner attended four classes from July 2013 to September 24, 2013, not counting Friday or Saturday services. Turner verified that he was on the list, but Dome told him that he was not. Turner spoke to corrections staff who told him they would look into the matter. Turner wrote to Captain Burton ("Burton") and complained that Dome would not allow him to attend religion classes. Burton told Turner he would look into the matter. Dome then told Turner that, since he "liked to talk," Turner would never go to class while he was the sergeant of the D/East Building. Turner then made a written request for a transfer to another building or to the other side of D/East.

Turner spoke to Counselor Scott-Knight (Knight") and complained that he was treated differently from other inmates and requested a transfer. After writing to numerous prison officials, Turner was told by Knight that she would see him in March 2014 for his classification. Turner accused Knight of some sort of relationship with Dome and believed that Knight was helping or conspiring with Dome. That same morning after Turner spoke with Burton, he saw Dome go into the counselor's office to speak to Knight. When Dome returned, Burton asked him what was the problem and he replied that he did not like Turner and Turner responded in kind. That afternoon while in the yard, Dome made disparaging comments to Turner. Turner was called into the building and told by Dome to pack his bag, that he was "out of his building," and

2

to go lock in, but Turner was never moved. On September 3, 2013, Turner filed a complaint for harassment.

Turner filed a formal complaint on September 11, 2013, to Delaware Department of Correction ("DOC") Commissioner Coupe ("Coupe") and complained of issues with roaches, jobs, educations, programs, and he requested a transfer from the VCC. Turner also made a formal complaint to Pierce regarding the unfair treatment he had received, told Pierce that he was at his wits end with Dome, indicated that he had met with Burton regarding the problem, but that it was getting worse.

On September 24, 2013, Turner was told to pack his bags, and he was moved to the Security Housing Unit ("SHU"). Turner had no write-ups or major infractions and questioned the move. C/O Torres ("Torres") told Turner the reason for the move was the four-page letter Turner had written to the Commissioner's office. The next day, Turner wrote to counselor McMahon ("McMahon"), Pierce, and other prisoner officials and asked why he had been transferred to SHU. McMahon advised Turner that the warden could house him wherever he chose. When he received no answers, Turner submitted a grievance concerning his transfer to SHU. Next, he wrote to Bureau of Prisons ("BOP") Bureau Chief Perry Phelps ("Phelps") and asked him to check his status because he was now housed in SHU. Phelps responded and advised Turner that he had a classification of fifteen points, medium housing.[2] Turner then wrote to Pierce on October 27, 2013, included the memo from Phelps, and asked why he remained in SHU when he had only fifteen points which warranted a medium-high security status. He received no answer.

---

[2] According to McMahon, as of March 25, 2014, Turner had acquired 17 points, maximum security.

On October 29, 2013, Turner was advised by Captain Rispoli ("Rispoli") that the warden had transferred him to SHU because Turner had "to learn a lesson." Turner wrote to Deputy Warden Parks ("Parks") and submitted another grievance for retaliation. Turner wrote to Coupe on October 31, 2013, complained of the transfer to SHU, and asked him to look into the matter. He again wrote to Coupe on November 14, 2013, and asked Coupe to transfer him from the VCC. Coupe referred Turner to the warden.

Burton told Turner that the warden had transferred him to SHU because of the letter he had written to Coupe when Turner was housed in D Building. Turner wrote to Major Brennan ("Brennan") and to Carroll Powell ("Powell") in support services and asked for help in obtaining an interstate compact transfer and he spoke to Staff Lt. Reynolds ("Reynolds") who informed Turner that the warden did not like him, that the warden had transferred Turner to SHU for the letter he had written and said, "I told you to put your pen down."

Turner wrote to Major Carrothers ("Carrothers") on November 27, 2013, about the transfer to SHU, retaliation, and right to due process. Turner sent a letter on January 12, 2014, to the BOP complaining of his transfer to SHU, and he spoke to Reynolds on March 21, 2014, who advised him that Pierce had placed Turner in SHU. On April 23, 2014, Reynolds told Turner that he remained on the SHU list and that it would take two years before he was transferred from SHU. Reynolds told Turner that he "should not have pissed Warden Pierce off so when he gives the OK then you will leave." On June 2, 2014, Turner wrote to Phelps and asked why he remained on the SHU list and why it would take two years to be transferred from SHU.

### B. Submissions by the Parties

During July 2013, an Imam conducted Arabic classes on Wednesday afternoons and, in August 2013, an Imam conducted Arabic classes on Wednesday afternoons and Islamic classes

4

were also held. (D.I. 23 ex. F.) Lists of inmates indicated those allowed to attend the classes.[3] Islamic classes were not held during the month of September 2013 due to other programming. (*Id.*)

On March 28, 2013, Turner was classified from maximum security to medium security. (D.I. 23 ex. C, ¶ 4.) The Institutional Based Classification Committee ("IBCC") approved the classification on April 4, 2013, and Turner was transferred to that security level on May 21, 2013. (*Id.*)

On April 13, 2013, Turner received a disciplinary report and was charged with demonstrations, disorderly or threatening behavior, disrespect, and failing to obey an order. (D.I. 23 ex. A.) Turner was transferred to isolation on pre-hearing detention, and he was found guilty of disorderly or threatening behavior, disrespect, and failing to obey an order. (*Id.* at ex. B.) On September 7, 2013, Turner received a disciplinary report and was charged with disorderly or threatening behavior and failing to obey an order. (D.I. 23 ex. D.) Turner was found guilty of disrespect and failing to obey an order. (*Id.* at ex. E.)

On September 19, 2013, Turner sent a letter to Coupe and requested a transfer through the Interstate Compact Agreement to another facility. (*Id.* at ex. C, ¶ 5.) The letter was forwarded to Pierce for consideration. (*Id.*) Pierce states that the letter "gave [him] concern for Turner's assigned security classification level. (*Id.*) Pierce, Security, and Treatment Staff reviewed the statements and felt that Turner presented a risk to the safe and secure operation of the facility. (*Id.*) On September 24, 2013, Turner was administratively transferred from medium security to maximum security at the personal direction of Pierce. (*Id.* at ex. C, ¶ 4.) There is no requirement

---

[3]The court was not provided with any of the lists.

under DOC polices and procedures that an inmate be charged with a criminal violation to transfer the inmate administratively for security reasons. (*Id.* at ex. C, 14.)

On October 10, 2013, Turner wrote to Phelps seeking a review of grievances submitted and his classification. (D.I. 27 ex. C, attachment 2.) Phelps forwarded the letter to Pierce for review. (*Id.*) Turner submitted grievances regarding his classification on October 28, 2013 and November 2, 2013. (D.I. 3 ex. E.)

On January 30, 2014, the IBCC classified Turner to maximum security, as recommended by the Multi-Disciplinary Team (MDT") based upon DOC point-based risk assessment scoring process. (D.I. 23 ex. C, ¶ 8.) The scoring process considered Turner's age, criminal history, remaining time to be served, and his institutional conduct which included the April 13, 2013 and September 7, 2013 disciplinary reports. (*Id.*)

In September 2014, the IBCC conducted another classification review and voted to reduce Turner's security classification to medium security (although it was not unanimous), and agreed there was insufficient justification to support Turner's request for an Interstate Compact transfer. (D.I. 23, ex. C, ¶¶ 10, 11; D.I. 27 ex. C.) Pierce exercised his authority and vetoed the classification decision. (*Id.*) Turner remains classified to maximum security until his next classification review. (*Id.*)

Pierce states that he vetoed the maximum security classification based upon his professional consideration of the following variables: (1) the security threat Turner posed to the staff and other VCC inmates and Pierce's responsibility to maintain security and order in the VCC; (2) the vote to reduce Turner's security was not unanimous as one member felt that Turner was not ready to transition to a lower security level; and (3) upon review of Turner's housing

status since his last classification, Pierce found that Turner had failed to progress to a less restrictive maximum environment and felt Turner needed additional time in maximum security so prison officials could observe his behavior to determine the appropriateness of a lower security environment. (*Id.* at ex. C, ¶ 11.)

On October 17, 2014 and November 5, 2014, Turner submitted grievances regarding the veto of the medium security classification. (D.I. 27 exs. A, C.) Turner was moved into a less restrictive maximum security unit on December 24, 2014. (*Id.* at ex. C, ¶ 12.) He is scheduled for a classification review in late 2015. (*Id.*)

### III. STANDARD OF REVIEW

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the initial burden of proving the absence of a genuinely disputed material fact relative to the clams in question. *See Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). Material facts are those "that could affect the outcome" of the proceeding, and "a dispute about a material fact is 'genuine' if the evidence is sufficient to permit a reasonable jury to return a verdict for the nonmoving party." *Lamont v. New Jersey*, 637 F.3d 177, 181 (3d Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

The burden then shifts to the non-movant to demonstrate the existence of a genuine issue for trial. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986); *Williams v. Borough of West Chester, Pa.*, 891 F.2d 458, 460-461 (3d Cir. 1989). Pursuant to Rule 56(c)(1), a non-moving party asserting that a fact is genuinely disputed must support such an assertion by: "(A) citing to particular parts of materials in the record, including depositions, documents,

electronically stored information, affidavits or declarations, stipulations . . ., admissions, interrogatory answers, or other materials; or (B) showing that the materials cited [by the opposing party] do not establish the absence . . . of a genuine dispute . . . ." Fed. R. Civ. P. 56(c)(1).

When determining whether a genuine issue of material fact exists, the court must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *See Scott v. Harris*, 550 U.S. 372, 380 (2007); *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007). A dispute is "genuine" only if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *See Anderson*, 477 U.S. at 247-249. *See Matsushita Elec. Indus. Co.*, 475 U.S. at 586-587 ("Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"). If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. at 322.

The defendants move for summary judgment on the grounds that there is no genuine issue of material fact and judgment is appropriate as a matter of law.

## IV. DISCUSSION

The court liberally construed Turner's amended complaint as alleging that Pierce retaliated and transferred him to SHU after he complained to the DOC Commissioner and that Dome retaliated against him after he made complaints against him. Even when viewing the evidence in the light most favorable to Turner, the nonmoving party, no reasonable jury could find that the defendants violated Turner's constitutional rights.

In the retaliation context, the Third Circuit has stated that "[g]overnment actions, which standing alone, do not violate the Constitution, may nonetheless be constitutional torts if motivated in substantial part by a desire to punish an individual for exercise of a constitutional right." *Mitchell v. Horn*, 318 F.3d 523, 530 (3d Cir. 2003); *Allah v. Seiverling*, 229 F.3d. 220, 224-25 (3d Cir. 2000); *see also Williams v. Meyers*, 165 F. App'x 201 (3d Cir. 2006) (unpublished) (inmate alleged he was fired from his prison kitchen job in retaliation for filing grievances against his supervisor, summary judgment for defendant); *Mt. Healthy City School Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274 (1977) (in the non-prisoner context, non-tenured teacher could sue for retaliation alleging he was fired for exercising his free speech).

"Retaliation for the exercise of constitutionally protected rights is itself a violation of rights secured by the Constitution actionable under § 1983." *White v. Napoleon*, 897 F.2d 103, 111-12 (3d Cir. 1990). To state a claim for retaliation, Turner must demonstrate: (1) constitutionally protected conduct; (2) sufficiently adverse action was taken by prison officials; and (3) a causal link between the exercise of his constitutional rights and the adverse action taken against him. *Mitchell*, 318 F.3d at 530; *see also Rauser v. Horn*, 241 F.3d 330, 333 (3d Cir. 2001); *Allah v. Seiverling*, 229 F.3d at 225). The causation element requires a plaintiff to prove either: (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link. *See Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007); *Krouse v. American Sterilizer Co.*, 126 F.3d 494, 503-04 (3d Cir. 1997). "[O]nce a prisoner demonstrates that his exercise of a constitutional right was a substantial or motivating factor in the challenged decision, the prison officials may still prevail by proving that they would have

made the same decision absent the protected conduct for reasons reasonably related to a legitimate penological interest." *Id.* at 334.

### A. Claim against Dome

The evidence of record does not support Turner's claim of retaliation by Dome. In his opposition to the motion for summary judgment Turner states that he spoke to Imam Anas on March 2, 2014 and was told that he was on the list for classes in the chapel. (D.I. 27 at 9.) Turner argues that he was told that Dome was not allowing him to attend classes, and that Dome took this action after he submitted grievances and wrote to Dome's supervisor. (*Id.*)

The amended complaint refers to alleged retaliatory conduct occurring in 2013, not 2014. In addition, while Turner alleges that the alleged retaliatory conduct occurred after he submitted grievances and wrote to Domes supervisor, he provided nothing to support his argument. Indeed, while the court has no obligation to do so, it scoured the record for evidence of a grievance, letter, or any type of constitutionally protected conducted by Turner prior to Dome's alleged retaliatory acts and found none.

Given that the elements of a retaliation claim have not been met, the court concludes that no reasonable jury could find for Turner on his claim against Dome. Therefore, the court will grant the motion for summary judgment as to the retaliation claim against Dome.

### B. Claim against Pierce

The amended complaint alleges retaliation by Pierce when Turner was administratively transferred to maximum security on September 24, 2013.[4] Construing the facts in the light most

---

[4] In his opposition to the motion for summary judgment Turner refers to alleged retaliatory conduct when Pierce vetoed the IBCC's medium security classification in September 2014. That issue is not before the court. Regardless, the evidence of record does not demonstrate the elements of retaliatory conduct with regard to the veto. Notably, there is no evidence of protected

favorable to Turner, he engaged in protected conduct when he wrote to Coupe on September 19, 2013, and sought a transfer under the Interstate Compact, he subjected to an adverse action when he was administratively transferred to maximum security, and causation exists given the short proximity in time between the September 19, 2013 letter and the September 24, 2013 transfer.

Pierce, however, provided a reason for the action he took. Pierce states that the letter gave him concern for Turner's assigned security classification level and, that after he, Security, and Treatment Staff reviewed the statements, they felt that Turner presented a risk to the safe and secure operation of the facility. Pierce's affidavit shows that he would have made the same decision absent the protected conduct for reasons reasonably related to a legitimate penological interest. In light of the foregoing, the court finds summary judgment is appropriate as to the claim raised against Pierce.

## V. CONCLUSION

For the above reasons, the court will grant the defendants' motion for summary judgment and will deny the plaintiff's motion to dismiss.

An appropriate order will be issued.

_____
UNITED STATES DISTRICT JUDGE

_Jan 6_, 2016
Wilmington, Delaware

---

constitutional conduct or a causal link between the exercise of constitutional conduct and the adverse action. In addition, Pierce demonstrated that he vetoed the recommendation for reasons reasonably related to a legitimate penological interest

11